UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Case No. 1:09-cr-181 |
| | ) | *Collier/Carter* |
| EDDIE ROLLINS | ) | |

REPORT AND RECOMMENDATION

I. Introduction

Defendant's motions to suppress [Docs. 304 and 543] have been referred by the District Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). The undersigned is asked to decide whether vehicle searches following two separate traffic stops were valid inventory searches as opposed to impermissible searches incident to the defendant's arrest. The undersigned is also asked to determine whether the defendant was improperly deprived of his Fifth Amendment right to remain silent. Since I conclude that the vehicle searches were valid inventory searches and that defendant validly waived his right to remain silent, it is RECOMMENDED defendant's motions to suppress be DENIED.

II. Relevant Facts

The undersigned held an evidentiary hearing on Defendant's motion to suppress on July 1, 2010. The motion to suppress evidence found in defendant's vehicles concerns two separate traffic stops involving the defendant. One occurred on September 15, 2008 and the other occurred on June 25, 2009. Jon Bell and Alvis Hawes, the officers involved in the two traffic stops, respectively, testified at the evidentiary hearing. Detective Roger Johnson testified

1

concerning the interview of the defendant which took place October 15, 2009. No other witnesses testified.

### A. Motion to Suppress Evidence Found During Traffic Stops

*1. The June 15, 2008 Traffic Stop*

Deputy Jon Bell is a canine officer with the Grundy County Sheriff's Department. He has approximately four years of experience in law enforcement. On June 15, 2008, he was traveling in Gruetli-Laager, Tennessee in an unmarked 1999 Jeep Cherokee equipped with blue lights. The vehicle behind him, following very closely, passed him in a no-passing zone on State Highway 108, a two lane road. Deputy Bell activated his blue lights, and defendant pulled over into the private driveway of a residence thereby blocking the driveway. Defendant exited his vehicle, approached Deputy Bell, and said to him, "don't take me to jail." Deputy Bell asked defendant why he would do that, and the defendant responded, "I don't have a driver's license, it has been revoked." At that point, Deputy Bell asked the defendant to sit in the patrol car while he checked the defendant's license status.

After determining that the defendant's driver's license was indeed revoked, Bell told the defendant he was going to jail. Bell testified he then procured a tow-slip, called for a tow truck, and walked to the defendant's vehicle to conduct an inventory search before the vehicle was towed. He opened the driver's side door and saw a rag. He opened up the rag and saw a glass pipe which he knew to be used for smoking methamphetamine. The pipe appeared to have methamphetamine residue in it. In the glove box, he found two bottles of iodine and a bag of pseudoephedrine, both precursors for manufacturing methamphetamine.

Bell testified that when he arrests a driver during a traffic stop and there is no passenger to drive the vehicle, he will have the vehicle towed. He further testified it is the Grundy County Sheriff's Department's policy to inventory all vehicles that are towed, and he considers inventorying under these circumstances to be part of his job duties. He was not expecting to find what he found in the vehicle.

On cross-examination, Bell was asked where the original tow slip for the vehicle was and he stated he did not know, that he did not have it. Bell testified he had to have the car towed because defendant had stopped in a private driveway and it was blocking the driveway. After finding the incriminating evidence in defendant's vehicle, Bell radioed Grundy County Sheriff Brent Myers who came to the scene. They then waited for Hazmat to arrive.

Defendant was subsequently charged for felonious possession of drug paraphernalia in violation of Tennessee law. Sheriff Myers prepared the affidavit of complaint to charge the defendant. Sheriff Myers stated in the affidavit of complaint that Deputy Bell, on routine patrol in Gruetli-Laager, stopped the defendant when the defendant started "riding his bumper and passed him in a no-passing zone." (Defendant's Exhibit 1 at p. 2). Sheriff Myers further stated, "As a result of the traffic stop, Deputy Bell found the defendant was driving on a revoked driver's license. The defendant was arrested and placed into custody. Deputy Bell began to search the vehicle incident to the arrest." *Id*.

   *2. The June 25, 2009 Traffic Stop*

On June 25, 2009, Officer Alvis Hawes, employed by the Tracy City Police Department for less than a year, was on routine patrol duty in Tracy City. While using radar, he clocked the defendant driving 54 mph in a 30 mph zone. He started following defendant's vehicle and

3

watched it as it went through the bank parking lot and parked in front of the Dutchmaid Bakery in Tracy City. Hawes followed, parked, and approached the vehicle driven by defendant. Hawes asked the defendant for his license, registration, and proof of insurance. The defendant said he had none of these. Hawes then asked for the defendant's birth date and social security number, which he received, and proceeded to the police radio to give this information to the dispatcher. The dispatcher called back and responded that the defendant's license had been revoked. At this point, Officer Hawes decided he would arrest the defendant.

Meanwhile, Officer Jon Bell heard the exchange over the police radio and recognized defendant Eddie Rollins' name. He called Hawes and informed him that the defendant might have methamphetamine on him. With this information, Hawes waited for Bell to arrive before doing anything further. When Bell arrived, Hawes put the defendant under arrest and placed him in the back of the police vehicle. Bell asked him if there was anything illegal in the car. The defendant responded, "no."

Hawes testified he then began an inventory search in anticipation of having the vehicle towed. He searched the cab of the vehicle and then the trunk where he found two 2-liter coke bottles filled with what appeared to be Coleman fuel and cans of Heet. He recognized these items as items used to manufacture methamphetamine.

Hawes testified that the Tracy City Police Department has a verbal policy to inventory all vehicles that are to be towed. He testified that his supervisors require him to make such an inventory and that he could be subject to discipline if he did not inventory items in a vehicle before having it towed. Hawes further testified that if he arrests the driver, the vehicle is towed unless there is someone present who can drive the vehicle away. The government introduced

Exhibit 1 constituting a vehicle tow-in report dated June 25, 2009 indicating that Eddie L. Rollins' four-door Chevy Lumina was towed by Monteagle Wrecker Service at approximately 7 pm. This report has a box at the bottom of the page to check whether the inventory was performed and to list the items inventoried. The report indicates that an inventory was performed and a number of items are listed. Hawes testified that once he found the items in the trunk, however, he discontinued the inventory. The items found in the trunk were indicative of methamphetamine manufacturing. Hawes further testified that anytime a vehicle is left on the road or on private property after an arrest, the vehicle has to be towed. In this instance, the Dutchmaid Bakery owner came outside and asked Hawes how long the vehicle would be there.

### B. The October 15, 2009 Interview

Detective Roger Johnson testified concerning the October 15, 2009 interview which defendant contends violated his Fifth Amendment rights. Detective Johnson has been a detective with the Marion County Sheriff's Department for the past ten years. He is currently, and at all times relevant to this particular motion, assigned to the Federal Drug Enforcement Agency (DEA) as a DEA Task Force officer. In the fall of 2009, he was investigating many suspects in a methamphetamine manufacturing and distribution conspiracy. During the course of the investigation, Detective Johnson learned through interviews that the defendant was gathering methamphetamine precursor chemicals. Detective Johnson called DEA Task Force Officer Tim Garner to talk to him about the defendant. Johnson thought that Garner might be using the defendant in another investigation as an informant. Johnson wanted to ask Garner for permission to speak to the defendant, and he also knew Garner would be able to reach the defendant.

On October 15, 2009, Garner called Johnson and told him he was going to the defendant's residence to pick him up, and they arranged to meet. They rendezvoused in Gruetli-Laager, Tennessee where Johnson parked his car and entered Garner's Chevrolet Suburban in the back seat with the defendant. The Gruetli-Laager police chief was sitting in the front seat with Tim Garner. They drove to a city park and parked behind some trees for privacy.

Johnson explained to the defendant that he wanted to interview him regarding an investigation which was entirely separate from the investigation that he (defendant) and Tim Garner had been involved in together. Johnson then pulled out a written waiver form and read the defendant his *Miranda* rights verbatim from the form. The defendant signed the written form waiving his rights.

Johnson testified the defendant was not in custody, but he gave the defendant his rights because he wanted him to know that he could be prosecuted for any incriminating statements he gave. The interview lasted about an hour. The tone of the conversation was generally calm. The defendant was not handcuffed; he was not threatened or promised anything. A couple of times Agent Garner expressed surprise when defendant said he knew a suspect under investigation because Garner had previously asked defendant about that person and defendant had denied knowing or being involved in drug trafficking with that person.

### III. Analysis

#### A. The Traffic Stops

Searches which are not conducted pursuant to a valid search warrant "are per se unreasonable under the Fourth Amendment - subject to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347 (1967), *Mincey v. Arizona*, 437 U.S.

385, 390 (1978). One of those established exceptions is an inventory search. *Florida v. Wells*, 495 U.S. 1, 4 (1990); *Colorado v. Bertine,* 479 U. S. 367, 372 (1987). "This exception recognizes that in addition to investigating crime, officers have an established caretaking role vis-à-vis the public. Inventory searches further legitimate goals of protecting property from theft or damage, preventing property disputes between the owner and police, and mitigating safety risks inherent in taking possession of unknown items." *United States v. Tackett*, 486 F.3d 230, 232 (6th Cir. 2007) (citing *South Dakota v. Opperman*, 428 U.S. 364, 368 (1976)). An inventory search extends to the trunk as well as to the interior of the vehicle. *United States v. Duncan,* 763 F.2d 220, 223 (6th Cir. 1985).

In general, "reasonable police regulations relating to inventory procedures administered in good faith satisfy the Fourth Amendment." *Bertine*, 479 U.S. at 374; *accord Tackett*, 486 F.3d at 232. "An inventory search may only be conducted after the police lawfully take custody of a vehicle." *United States v. Smith*, 510 F.3d 641, 650 (6th Cir. 2007); *accord United States v. Allen*, 2009 WL 3297286 *5 (E.D. Tenn. Oct. 13, 2009) (Mattice, J.) A written policy for an inventory search is not required; so long as the search is conducted according to standard police procedures and is not conducted for investigative purposes. *United States v. Lumpkin*, 159 F.3d 983, 987 (6th Cir. 1998) (citing *Florida v. Wells*, 495 U.S. 1, 5 (1990)); *Tackett*, 486 F.3d at 252 ("officers must conduct a permissible inventory search in good faith, not as a pretext for criminal investigation.") "However, the fact that an officer suspects that contraband may be found does not defeat an otherwise proper inventory search." *Lumpkin*, 159 F.3d at 987 (citing *United States v. Harvey*, 16 F.3d 109, 112 (6th Cir. 1994); *United States v. Lewis*, 3 F.3d 252, 254 (8th Cir.1993) (per curiam) (noting that "[t]he presence of an investigative motive ... does not invalidate an otherwise valid

7

inventory search")); *see also Tackett*, 486 F.3d at 252 ("officers' suspicion that they may find contraband does not invalidate an otherwise proper inventory search."). Officers do not enjoy their customary discretion in conducting an inventory search; they must follow the applicable policy. *Tackett*, 486 F.3d at 252. Further, a search of closed containers within a vehicle must be conducted pursuant to an express policy to search closed containers in order to fall within the inventory exception. *Florida v. Wells*, 495 U.S. 1, 5 (1990). Absent an express policy to search closed containers during an inventory search, any search of closed containers will be deemed a violation of the Fourth Amendment. *Id.*; *United States v. Musick*, 291 Fed. Appx. 706, 721 (6th Cir. Aug. 29, 2009).

Finally, the last case which must be discussed in regard to this particular motion to suppress is *Arizona v. Gant*, 129 S.Ct. 1710 (2009). In *Gant*, the Supreme Court held "[p]olice may search a vehicle incident to a recent occupant's arrest only if the arrestee is within reaching distance of the passenger compartment at the time of the search or it is reasonable to believe the vehicle contains evidence of the offense of arrest. When these justifications are absent, a search of an arrestee's vehicle will be unreasonable unless police obtain a warrant or show that another exception to the warrant requirement applies." *Id.* at 1723-24.

Defendant argues the searches of his vehicles following both the September 15, 2008 traffic stop and the June 25, 2009 traffic stop were improper searches incident to arrest, and under *Gant* all evidence found in his vehicles must be suppressed. The government contends, *inter alia,* that the searches were valid inventory searches, and, therefore, suppression is not required. I find both searches were valid inventory searches.

In both the September 15, 2008 traffic stop and the June 25, 2009 traffic stop, the officer involved testified he conducted an inventory search after arresting the defendant. In both instances there was no passenger to drive defendant's vehicle. In the September 15, 2008 incident, the vehicle was parked in a private driveway blocking it. In the second incident, the vehicle was parked in front of a business, and the business owner expressed a concern that the vehicle be removed quickly. Both officers testified that it is standard operating procedure to have the vehicle towed when the driver is arrested and there is no passenger available to drive the vehicle away. Both officers also testified that when they must have a vehicle towed, it is standard operating policy to conduct an inventory search of the vehicle prior to it being towed. I find both officers' testimony to be credible.

I note that Sheriff Myers stated in his affidavit of complaint that Deputy Bell (the September 16, 2008 incident) searched the vehicle incident to defendant's arrest for driving without a license. However, Deputy Bell is the individual who arrested the defendant and conducted the search, not Sheriff Myers, and I find Bell to be credible. Further, police often act believing they have more than one valid basis for their conduct. That one basis for their conduct is invalid does not automatically invalidate the other basis. I conclude defendant's vehicle was properly inventoried following defendant's arrest on September 16, 2010.

As to the second incident on June 25, 2009, Hawes clearly suspected there may be evidence of methamphetamine manufacturing in defendant's vehicle before he inventoried the vehicle. Bell told him there might be. However, as previously stated, the presence of an investigative motive does not invalidate an otherwise valid inventory search. Hawes had already decided to arrest the defendant for driving without a license before Bell contacted him to tell him

about defendant's prior involvement in methamphetamine. Once the defendant was placed under arrest, Hawes acted according to standard operating procedures and impounded the vehicle and inventoried it. I conclude both searches were valid inventory searches, and, therefore, suppression of evidence found in those searches in not warranted.

### B. The October 15, 2009 Interview

Defendant asserts he was "placed into a vehicle with three law enforcement officers...." and was therefore "intentionally placed into an uncomfortable and intimidating setting to procure his statement." (Defendant's Memorandum in Support of Motion to Suppression, Doc. 304-1 at p. 3). Defendant further argues that he was "deceived" into waiving his right to be silent because Officer Johnson told him that information he provided "may" be used against him "should the U.S. Attorney decide to prosecute him." *Id.* at 4. Defendant asserts this language is deceptive because it indicates "that prosecution probably would not be forthcoming from the information obtained in the statement." *Id.* Defendant also asserts that the *Miranda* warnings require police to tell a defendant that anything you say "can and will be used against you in a court of law." *Id.* Defendant cites no authority for this argument.

Pursuant to the Fifth Amendment's privilege against self-incrimination, police must give a suspect in police custody the standard Miranda warnings before questioning or the defendant's statements are not admissible at trial in the prosecution's case in chief. *Dickerson v. United States*, 530 U.S. 428 (2000); *Miranda v. Arizona*, 384 U.S. 436 (1966). The test for determining when a detention has occurred for purposes of the Fourth Amendment and when a custodial detention has occurred for purposes of the Fifth Amendment are not the same. *Berkemer v. McCarty*, 468 U.S. 420, 436-441 (1984); *United States v. Salvo*, 133 F.3d 943, 949 (6th Cir.

10

1998); *United States v. Knox*, 839 F.2d 285, 289-291 (6th Cir. 1988). The test for determining whether a seizure has occurred under the Fourth Amendment is whether a reasonable person in the defendant's position would have felt free to leave, given the totality of the circumstances. For Fifth Amendment purposes, however, "the ultimate inquiry is simply whether there [was] a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Stansbury v. California*, 511 U.S. 318, 322 (1994) (per curiam); *see also Miranda v. Arizona*, 384 U.S. 436, 444 (1966) (custodial interrogation is "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way."); *United States v. Panak,* 552 F.3d 462, 465 (6th Cir. 2009) (same); United *States v. Crossley*, 224 F.3d 847, 861 (6th Cir. 2000) (same). Thus, it is possible for a person to be detained but not in custody for purposes of requiring Miranda rights. *Berkemer*, 468 U.S. at 427.

Defendant was not in custody so as to require *Miranda* warnings when he gave his statements to Officer Johnson. Defendant had agreed to cooperate and meet with Officer Johnson for the purpose of talking to him about his knowledge of methamphetamine trafficking in the community. Thus *Miranda* warnings were not required.

Moreover, even if *Miranda* warnings were required, the warnings given the defendant were adequate. In *Miranda,* the Court used "can," "may," and "will" when setting forth the proper warnings regarding a suspect's right to remain silent: "He must be warned prior to any questioning that he has the right to remain silent, that anything he says ***can*** be used against him in a court of law...."  *Miranda*, 384 U.S. at 479 (emphasis added). "Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make ***may***

11

be used as evidence against him...." *Id* at 444 (emphasis added). "The warning of the right to remain silent must be accompanied by the explanation that anything said *can* and *will* be used against the individual in court." *Id* at 469 (emphasis added). In *Dickerson v. United States,* 530 U.S. 428, 435 (2000), the Supreme Court used "can" when explaining the proper language to use regarding a defendant's right to remain silent: "a suspect has the right to remain silent, that anything he says ***can*** be used against him in a court of law...." (emphasis added). The *Dickerson* Court did not use or require the use of the word "will" and neither will I. Further, I cannot fault Johnson for using "may" when the Supreme Court itself used that word for *Miranda* warnings. Additionally, nothing Officer Johnson said indicated that defendant's statement would *probably not* be used against him, and Defendant was not an unsophisticated individual unfamiliar with law enforcement. I conclude there was nothing deceptive about the warnings Johnson gave to defendant, and defendant voluntarily and knowingly waived his right to remain silent.

## IV. Conclusion

For the reasons stated herein, it is RECOMMENDED defendant's motions to suppress be DENIED.[1]

                                                                            *s/William B. Mitchell Carter*
                                                                            UNITED STATES MAGISTRATE JUDGE

---

[1] Any objections to this Report and Recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 59(b)(2) of the Federal Rules of Criminal Procedure. Failure to file objections within the time specified waives the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 140, 88 L.Ed.2d 435, 106 S. Ct. 466 (1985). The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive or general. *Mira v. Marshall*, 806 F.2d 636 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Federation of Teachers*, 829 F.2d 1370 (6th Cir. 1987).